**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANDREA CARMICHAEL, on behalf of herself and all individuals similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> IROQUOIS MEMORIAL HOSPITAL, <br><br> Defendant. | Case No. _____ <br><br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Andrea Carmichael ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class Members"), by and through her attorneys, brings this Class Action Complaint against Defendant Iroquois Memorial Hospital ("IMH" or "Defendant"), and alleges upon personal knowledge as to herself and information and belief as to all other matters.

### I.       <u>INTRODUCTION</u>

1.       Plaintiff brings this class action against IMH for its failure to secure and safeguard her and the Class Members' personally identifying information ("PII") and protected health information ("PHI"), including names, addresses, dates of birth, Social Security numbers, medical record numbers and account numbers, and diagnostic information, resulting in a massive and preventable data breach.

2.       IMH operates as a regional healthcare provider offering consumer responsive medical services. IMH provides pharmacy, specialty clinic, outpatient service, and clinical services to its patients and consumers in Illinois and Indiana.

3.      As part of its business practice and to provide services to its patients, Defendant collects, stores, and maintains the PII and PHI of its patients and employees including Plaintiff and Class Members.

4.      In December 2025, the ransomware group PEAR listed IMH as a victim of a data breach after the organization was reportedly notified of suspicious activity affecting its digital infrastructure (the "Data Breach" or "Breach").[1] The types of data involved in the Breach includes: patient medical records and clinical notes, health insurance and billing information, name, date of birth, address, Social Security number, appointment schedules and treatment histories, and employee personnel and payroll records (collectively, "Private Information").

5.      To date, there is no indication that IMH has made any attempts to recover Plaintiff's and Class Members' Private Information.

6.      Upon information and belief, the victims of the Data Breach include current and former patients and employees of IMH.

7.      Based on the ransomware's announcement of the Breach, there is no question Plaintiff's and Class Members' Private Information is in the hands of cybercriminals who will continue to use the **stolen** Private Information for nefarious purposes for the rest of their lives.

8.      Due to Defendant's negligent failure to secure and protect Plaintiff's and Class Members' Private Information, cybercriminals have stolen and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of thousands of individuals.

---

[1] Sean Doyle, Iroquois Memorial Hospital Data Breach Allegedly Linked to PEAR Ransomware (Dec. 12, 2025); https://botcrawl.com/iroquois-memorial-hospital-data-breach/ (last visited Dec. 15, 2025).

9.      IMH owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure. IMH breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its clients' Private Information from unauthorized access and disclosure.

10.     Now, and for the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft will have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach.

11.     Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminution of the value of their Private Information, loss of privacy, and additional damages as described below.

12.     As a result of IMH's inadequate data security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class Members' Private Information was stolen and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose Private Information was exposed as a result of the Data Breach.

13.     Plaintiff, on behalf of herself and all other Class Members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, nominals damages, statutory

damages, punitive damages, equitable relief, attorney's fees and costs, and all other relief authorized by law.

## II.        THE PARTIES

14.        **Plaintiff Andrea Carmichael** is a citizen of Kentland, Indiana. As a condition of receiving healthcare services, IMH required Plaintiff Carmichael to provide it with her Private Information. Based on representations made by IMH, Plaintiff Carmichael believed IMH had implemented and maintained reasonable security and practices to protect her Private Information. With this belief in mind, Plaintiff Carmichael provided her Private Information to IMH in connection with receiving healthcare services provided by IMH.

15.        **Defendant Iroquois Memorial Hospital** is an Illinois not-for-profit corporation with its principal place of business in Watseka, Illinois. IMH may be served through its registered agent: Holly Galvin, 130 W Cherry St. Watseka, IL 60970. IMH also conducts business and serves patients and employees in Indiana through its Kentland, Indiana location.[2]

## III.        JURISDICTION AND VENUE

16.        This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiff, are citizens of a different state than Defendant.

17.        This Court has personal jurisdiction over Defendant because Defendant is registered to do business in the State of Illinois; has its principal place of business in this District;

---

[2] *Our Clinics*, Iroquois Memorial Hospital: https://iroquoismemorial.com/Our-Locations (last visited Dec. 15, 2025).

conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

18.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) because Defendant resides in this District.

## IV.    FACTUAL ALLEGATIONS

*Defendant IMH's Collection of PII/PHI*

19.    IMH operates Iroquois Memorial Hospital in Watseka, Illinois, and provides additional healthcare services at 7 locations in Watseka and surrounding communities.[3] Additionally, IMH provides services and employment in Indiana through its Kentland, Indiana location.[4]

20.    In the regular course of its business, IMH collects and maintains the Private Information of its current and former patients and employees. IMH required Plaintiff and Class Members to provide their Private Information as a condition of receiving healthcare services or employment from IMH.

21.    Plaintiff and Class Members are current or former patients or employees of IMH and entrusted IMH with their Private Information.

22.    IMH's website contains a Notice of Privacy Practices ("Privacy Policy").[5] The Privacy Policy "describes how medical information about you may be used and disclosed, and how you can get access to this information " and states "[w]e are required by law and committed as an

---

[3] *Our Clinics,* Iroquois Memorial Hospital: https://iroquoismemorial.com/Our-Locations (last visited Dec. 15, 2025).
[4] *Id.*
[5] *Privacy Policy*, Iroquois Memorial Hospital: https://iroquoismemorial.com/Privacy-Policy (last visited Dec. 15, 2025) [hereinafter "*Privacy Policy*"].

institution to maintain the privacy of protected health information and to provide individuals with this Notice of our legal duties and privacy practices with respect to protected health information."[6]

23.     IMH further states it is "required by law to comply with the terms and privacy practices stated in our notice that is currently in effect, and we pledge to you that we will do so."[7] Indeed, IMH was aware of its duty and responsibility to protect and safeguard Plaintiff's and Class Members' Private Information from unauthorized disclosure.

24.     Contrary to its representations, however, IMH failed to implement adequate data security measures to protect Plaintiff's and Class Members' Private Information, resulting in a devastating data breach that affected thousands of individuals

25.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

26.     IMH owed a duty to protect Plaintiff and Class Members from the harm that Defendant's insufficient data security and the consequential exposure of Private Information would cause, because such harm was foreseeable and reasonably preventable.

27.     IMH's duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated Defendant to require and ensure that it had implemented reasonable practices to keep Plaintiff's and Class Members' sensitive Private Information confidential and securely maintained, used and disclosed it for necessary and authorized purposes only, deleted the

---

[6] *Id.*
[7] *Id.*

data from network systems or applications when no longer necessary for legitimate business purposes, and trained its employees on reasonable cybersecurity red flags and protection techniques.

28.    The Private Information IMH collected and stored on its network systems when the Data Breach occurred included the unencrypted Private Information of Plaintiff and Class Members.

29.    IMG negligently failed to secure Plaintiff's and Class Members' Private Information and ensure that it had the adequate safeguards to protect Plaintiff's and Class Members' Private Information.

***The Data Breach***

30.    In December 2025, the ransomware group PEAR listed IMH as a victim of a data breach after the organization was reportedly notified of suspicious activity affecting its digital infrastructure.[8]

31.    This Breach aligns with PEAR ransomware's pattern of attacking healthcare, medical research, and clinical services organizations. Groups targeting hospitals and clinics typically focus on disrupting operations, stealing PHI, and publishing exfiltrated data to maximize financial leverage. Upon information and belief, Defendant's Breach was targeted.

32.    Although IMH has not provided details about what information was involved in the Breach, upon information and belief, the stolen information generally included one or more of the following: patient medical records and clinical notes, health insurance and billing information,

---

[8] Sean Doyle, *Iroquois Memorial Hospital Data Breach Allegedly Linked to PEAR Ransomware* (Dec. 12, 2025); https://botcrawl.com/iroquois-memorial-hospital-data-breach/ (last visited Dec. 15, 2025).

name, date of birth, address, Social Security number, appointment schedules and treatment histories, and employee personnel and payroll records.[9]

33.     Despite the ransomware group PEAR announcing the Breach, Defendant has not provided details of the root cause of the Data Breach, the identity of the cybercriminals who perpetrated the Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again and have not been shared with regulators or Plaintiff and Class members, who retain a vested interest in ensuring that their information remains protected. Without these details, Plaintiff's, and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished

34.     Upon information and belief, Defendant has yet to send notice letters to victims of the Data Breach and does not have mailing information for all individuals who are victims of the Data Breach.

35.     By collecting, storing, and maintaining the PII and PHI of Plaintiff and Class Members, Defendant owed a duty to Plaintiff and Class Members to protect and safeguard their Private Information from unauthorized disclosures.

36.     Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendant's deficient security for patient data caused and allowed criminals to target and copy files containing Plaintiff's and Class Members' inadequately protected, unencrypted Private Information from Defendant's possession through the Data Breach.

37.     Because Defendant had a duty to protect Plaintiff's and Class Members' Private Information, Defendant should have known through readily available and accessible information

---

[9] *Id.*

about potential threats for the unauthorized exfiltration and misuse of such information. Thus, Defendant had a duty to ensure that its patients' and employees' Private Information was secured and protected from unauthorized disclosures to third parties.

38.     IMH failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation.

39.     IMH also failed to timely notify Plaintiff and Class members of the Breach.

40.     IMH's actions represent a flagrant disregard of the rights of Plaintiff and the Class, both as to privacy and property.

41.     As such, Plaintiff and the Class have sustained injuries and continue to be at an imminent and impending risk of identity theft and fraud.

***IMH Knew Criminals Target Private Information***

42.     At all relevant times, IMH knew, or should have known, that the Private Information that it collected and stored was a target for malicious actors. Indeed, IMH was clearly aware of the threat of a data breach. Despite such knowledge, IMH failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that IMH should have anticipated and guarded against. Despite such knowledge, IMH failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that IMH should have anticipated and guarded against.

43.     It is well known among companies that store sensitive personally identifying information that such information—such as the Private Information stolen in the Data Breach—is valuable and frequently targeted by criminals. In an article, *Business Insider* noted that "[d]ata

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

44.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[11] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[12]

45.     Private Information is a valuable property right.[13] The value of Private Information as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[16] It is so valuable to identity thieves that

---

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[11] *See 2023 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited Dec. 15, 2025).

[12] *See Id*.

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

46.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, Private Information, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

47.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[18]

48.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[19] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[20]

---

[17] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[18] *Id.*
[19] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[20] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014),

49.     Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

50.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

51.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of Private Information has Grave and Lasting Consequences for Victims***

52.     Theft of Private Information can have serious consequences for the victim. The FTC warns consumers that identity thieves use Private Information to receive medical treatment,

---

https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[21] Steager, *supra* note 25.
[22] *Id.*
[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

start new utility accounts, and incur charges and credit in a person's name.[24] [25]

53.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[26]

54.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[27]

55.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[28] It "is also more difficult to detect,

---

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Jan. 9, 2024).

[25] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[26] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[27] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Jan. 9, 2024).

[28] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

taking almost twice as long as normal identity theft."[29] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Private Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[30] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[31]

56.     Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN. Thus, a new SSN will not be provided until after the harm has already been suffered by the victim.

57.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[32]

58.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

     a.  Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters.

---

[29] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 28.

[30] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Jan. 9, 2024).

[31] *Id*.

[32] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [33]

59.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[34]

60.    It is within this context that Plaintiff and Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by and in the

---

[33] *See* Dixon & Emerson, *supra* note 36.
[34] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

possession of people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Defendant Failed to Comply with FTC Guidelines.***

61.     Data breaches are preventable.[35] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[36] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[37]

62.     The FTC has published guidelines that establish reasonable data security practices for businesses.[38]

63.     The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[39]

64.     The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[40]

---

[35] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[36] *Id.* at 17.
[37] *Id.* at 28.
[38] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[39] *Id.*
[40] *Id.*

65.     The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[41]

66.     According to information and belief, Defendant failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

67.     Based upon information and belief, Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity readiness.

68.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[42]

69.     Among other failures, Defendant had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[43]

---

[41] *Id.*

[42] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

[43] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

70.    Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[44]

71.    In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation and encryption of all Private Information—but IMH failed to comply with FTC and industry standard cyber security safeguards.

***Defendant Failed to Comply with HIPAA.***

72.    As a healthcare service provider handling medical patient data and providing services to patients, Defendant is a covered entity under HIPAA (45 C.F.R. § 160.103). As such, Defendant is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

73.    HIPAA's Privacy Rule establishes national standards for protecting health information, including health information that is kept or transferred in electronic form.

74.    IMH is required to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

75.    "Electronic protected health information" is "individually identifiable health information . . . that is: (i) transmitted by electronic media; [or] (ii) maintained in electronic media[.]" 45 C.F.R. § 160.103.

76.    The HIPAA Security Rule, 45 C.F.R. Part 164, Subpart C, requires IMH to:

---

[44] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

a.      Ensure the confidentiality, integrity, and availability of all electronic protected health information it or any business associate creates, receives, maintains, or transmits;

b.      Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.      Protect against any reasonably anticipated uses or disclosures of such information; and

d.      Ensure compliance by its workforce.

77.     HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[.]" 45 C.F.R. § 164.306(e).

78.     Additionally, HIPAA requires Defendant to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights[.]" 45 C.F.R. § 164.312(a)(1).

79.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, further requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of [the] breach[.]"

80.     IMH was also prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce[.]" The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

81.     IMH owed a duty to Plaintiff and the Class to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including

19

adequately training its employees (and any others who accessed Private Information within its computer systems) on how to adequately protect Private Information.

82.    IMH owed a duty to Plaintiff and the Class to disclose if their computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in individuals' decisions to entrust Defendant with their Private Information.

83.    IMH owed a duty to Plaintiff and the Class to disclose in a timely and accurate manner when data breaches occurred. To date, Defendant has yet to provide notice of the Breach to affected individuals.

84.    IMH owed a duty of care to Plaintiff and the Class because they were foreseeable and probable victims of any inadequate data security practices.

***Damages Sustained by Plaintiff and Class Members***

85.    Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

***Plaintiff Andrea Carmichael's Experience.***

86.     Plaintiff Carmichael is a patient of IMH and was required to provide her PII and PHI to receive services from IMH. Upon information and belief, Plaintiff Carmichael is a victim of the Breach and her Private Information was obtained by the unauthorized third party.

87.     Plaintiff Carmichael entrusted her Private Information to Defendant as a patient of Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Private Information secure from unauthorized access.

88.     By soliciting and accepting Plaintiff Carmichael's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

89.     Upon information and belief, Defendant was in possession of Plaintiff Carmichael's Private Information before, during, and after the Data Breach.

90.     Because of the Data Breach, there is no doubt Plaintiff Carmichael's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Carmichael and the Class are at an imminent risk of identity theft and fraud.

91.     Knowing that thieves intentionally targeted and accessed her Private Information, including her Social Security number, has caused Plaintiff Carmichael great anxiety beyond mere worry.

92.     The Data Breach has caused Plaintiff Carmichael to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

93.     Upon information and belief, Plaintiff Carmichael has noticed a significant uptick in spam emails, phone calls, and text messages which she did not receive prior to the Breach.

94.     Following the Data Breach, Plaintiff Carmichael made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. In total, Plaintiff Carmichael estimates she has already spent hours responding to the Data Breach.

95.     Plaintiff Carmichael will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

96.     Plaintiff Carmichael places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Carmichael entrusted Defendant with her Private Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

97.     Plaintiff Carmichael has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

98.     As a direct and traceable result of the Data Breach, Plaintiff Carmichael suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her first and last name paired with her Social Security number and other sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (f)

diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Carmichael and/or her medical providers; and (g) other economic and non-economic harm.

99.     Due to Defendant's negligence, Plaintiff Carmichael has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

100.    Plaintiff Carmichael has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Carmichael's Private Information will be wholly unprotected and at-risk of future data breaches.

## V.     CLASS ALLEGATIONS

101.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

102.    Plaintiff brings this action against Defendant on behalf of herself, and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> **All persons whose PII and/or PHI was compromised in the Data Breach, including those that received a notice letter.**

103.    Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

104.    Plaintiff reserves the right to amend or modify the above Class definition or to propose subclasses in subsequent pleadings and motions for class certification.

105.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

106.    The proposed Class meets the requirements of Federal Rule of Civil Procedure 23.

107.    **Numerosity**: The members in the Class are so numerous that joinder of each of the Class Members in a single proceeding would be impracticable. Although the true number of affected individuals is currently unknown to Plaintiff, Defendant services thousands of patients and it is likely that thousands of patients' information was involved in the Data Breach. The total number of affected individuals is ascertainable through Defendant's records.

108.    **Commonality and Predominance**: Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

      a.   Whether IMH had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' Private Information from unauthorized access and disclosure;

      b.   Whether IMH had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

      c.   Whether IMH failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' Private Information;

24

d.  Whether an implied contract existed between Class Members and IMH, providing that IMH would implement and maintain reasonable security measures to protect and secure Class Members' Private Information from unauthorized access and disclosure;

e.  Whether IMH engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

f.  Whether IMH breached its duties to protect Plaintiff's and Class Members' Private Information;

g.  Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach;

h.  Whether Defendant was negligent in permitting unencrypted Private Information belonging to thousands of individuals to be stored within its network;

i.  Whether Defendant was negligent in failing to adhere to reasonable data retention policies;

j.  Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon it by Plaintiff and Class Members;

k.  Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

25

l.  Whether Plaintiff and the Class suffered injuries as a proximate result of Defendant's negligent actions or failures to act;

m.  Whether Plaintiff and Class Members are entitled to damages and the measure of such damages and relief; and

n.  Whether Defendant's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages

109.    IMH engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

110.    **Typicality**: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had their Private Information compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by IMH, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

111.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel competent and highly experienced in data breach class action litigation, and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

112.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against IMH, so it would be impracticable for Class Members to individually seek redress from IMH's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

113.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

114.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

115.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

116.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

117.    IMH solicited, collected, stored, and maintained the Private Information of Plaintiff and Class Members on inadequately secured computer systems and networks.

118.    Upon accepting and storing Plaintiff's and Class Members' Private Information on its computer systems and networks, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

119.    IMH owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

120.    IMH's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

121.    IMH owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting the Private Information in its possession, custody, or control.

122.    IMH knew or should have known the risks of collecting and storing Plaintiff's and all other Class Members' Private Information and the importance of maintaining secure

systems. IMH knew or should have known of the many data breaches that targeted healthcare providers that collect and store Private Information in recent years.

123.   Given the nature of IMH's business, the sensitivity and value of the Private Information it maintains, and the resources at its disposal, IMH should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

124.   IMH was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

125.   IMH knew Plaintiff and Class Members relied on it to protect their Private Information. Plaintiff and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiff and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

126.   IMG was aware, or should have been aware, of the fact that cybercriminals routinely target healthcare entities through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

127.   IMH owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably

safeguard or delete such data and providing notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

128.    IMH's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

129.    IMH breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Private Information entrusted to it—including Plaintiff's and Class Members' Private Information.

130.    It was reasonably foreseeable to IMH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' Private Information to unauthorized individuals.

131.    But for IMH's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

132.    IMH's willful failure to abide by its duties to Plaintiff and Class Members was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

133.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

134.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach.

135.    Upon information and belief, Defendant has not yet sent notice of the Breach to affected individuals.

136.    Plaintiff and Class Members could have taken actions earlier had they been timely notified of the Data Breach.

137.    As a result of IMH's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in IMH's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of

the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

138.    The damages Plaintiff and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's negligent conduct.

139.    Plaintiff and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

140.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

141.    IMH's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

142.    IMH's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as IMH, of failing to employ reasonable measures to protect and secure Private Information.

143.    IMH's duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own
> or license, records that contain personal information concerning an Illinois
> resident shall implement and maintain reasonable security measures to protect

32

those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

144.  Additionally, under 815 ILCS 530/10, IMH had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach [...] in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10.

145.  IMH violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and IPIPA by failing to use reasonable measures to protect Plaintiff's and other Class Members' Private Information, by failing to provide timely notice, and by not complying with applicable industry standards. IMH's conduct was particularly unreasonable given the nature and amount of Private Information it obtains and stores, and the foreseeable consequences of a data breach involving Private Information including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

146.  IMH's violation of IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA constitutes negligence *per se*.

147.  Plaintiff and Class Members are within the class of persons that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to protect.

148.  The harm occurring as a result of the Data Breach is the type of harm that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class Members as a result of the Data Brach.

149.    It was reasonably foreseeable to IMH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Private Information to unauthorized individuals.

150.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of IMH's violations of harm IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA. Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in IMH's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## (On Behalf of Plaintiff and the Class)

151.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

152.    Plaintiff and Class Members gave IMH their Private Information in confidence, with the expectation that IMH would protect that information. Plaintiff and Class Members would not have provided IMH with this information had they known it would not be adequately protected. IMH's acceptance and storage of Plaintiff's and Class Members' Private Information created a fiduciary relationship between IMH and Plaintiff and Class Members. In light of this relationship, IMH must act primarily for the benefit of its clients, which includes safeguarding and protecting Plaintiff's and Class Members' Private Information.

153.    Due to the nature of the relationship between IMH and Plaintiff and Class Members, Plaintiff and Class Members were entirely reliant upon IMH to ensure that their Private Information was adequately protected. Plaintiff and Class Members had no way of verifying or influencing the nature and extent of IMH's data security policies and practices, and IMH was in an exclusive position to guard against the Data Breach.

154.    IMH has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' Private Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class Members' Private Information that it collected.

155.    As a direct and proximate result of IMH's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity

costs associated with effort attempting to mitigate the actual and future consequences of the Data

Breach; (v) the continued risk to their Private Information which remains in IMH's possession;

(vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and

repair the impact of the Private Information compromised as a result of the Data Breach; and (vii)

overpayment for the services that were received without adequate data security.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

156.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if

fully set forth herein.

157.    In connection with receiving healthcare services or employment, Plaintiff and

all other Class Members entered into implied contracts with IMH.

158.    Pursuant to these implied contracts, Plaintiff and Class Members paid money

to IMH and provided IMH with their Private Information. In exchange, IMH agreed to, among

other things, and Plaintiff understood that IMH would: (1) provide services to Plaintiff and

Class Members; (2) take reasonable measures to protect the security and confidentiality of

Plaintiff's and Class Members' Private Information; and (3) protect Plaintiff's and Class

Members' Private Information in compliance with federal and state laws and regulations and

industry standards.

159.    The protection of Private Information was a material term of the implied

contracts between Plaintiff and Class Members, on the one hand, and IMH, on the other hand.

Indeed, as set forth *supra*, IMH recognized the importance of data security and the privacy of

its clients' Private Information in its Privacy Policy. Had Plaintiff and Class Members known

that IMH would not adequately protect its clients' Private Information, they would not have received healthcare services or employment from IMH.

160.    Plaintiff and Class Members performed their obligations under the implied contract when they provided IMH with their Private Information and paid for healthcare services from IMH, or provided IMH with their labor.

161.    IMH breached its obligations under its implied contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and secure their Private Information and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' Private Information in a manner that complies with applicable laws, regulations, and industry standards.

162.    IMH's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

163.    Plaintiff and all other Class Members were damaged by IMH's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Private Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face

and will continue to face; and (vii) overpayment for services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

164.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

165.    This claim is pleaded in the alternative to the breach of implied contract claim.

166.    Plaintiff and Class Members conferred a monetary benefit upon IMH in the form of monies paid for healthcare services, or in the form of labor which enabled IMH to run its business, and through the provision of their Private Information.

167.    IMH accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. IMH also benefitted from the receipt of Plaintiff's and Class Members' Private Information, as this was used to facilitate billing services or employment.

168.    IMH appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

169.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from money it makes based on protecting Plaintiff's and Class Members' Private Information.

170.    Plaintiff and Class Members paid Defendant and/or their healthcare providers a certain sum of money, which was used to fund data security via contracts with Defendant.

171.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

172.    There is a direct nexus between money paid to Defendant and the requirement that Defendant keep Plaintiff's and Class Members' Private Information confidential and protected from unauthorized access and disclosure.

173.    Protecting the Private Information of Plaintiff and Class Members is integral to Defendant's business. Without their Private Information, Defendant would be unable to provide services or employment comprising Defendant's core business.

174.    Plaintiff's and Class Members' Private Information has monetary value.

175.    As a result of IMH's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made or labor with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments or labor without reasonable data privacy and security practices and procedures that they received.

176.    IMH enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

177.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

178.    Under the facts and circumstances outlined above, however, it is inequitable for Defendant to retain that benefit without payment of the value thereof.

179.    IMH should not be permitted to retain the money belonging to Plaintiff and Class Members because IMH failed to adequately implement the data privacy and security procedures

for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

180.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures.

181.    IMH acquired Plaintiff's and Class Members' Private Information through inequitable means in that it failed to disclose its inadequate data security practices, as previously alleged.

182.    If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have allowed Defendant to collect their Private Information.

183.    Plaintiff and Class Members have no adequate remedy at law.

184.    IMH should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, all gains that they unjustly received.

**COUNT VI**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")**
**(On Behalf of Plaintiff and the Class)**

185.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

186.    IMH offered and continues to offer healthcare services in the State of Illinois.

187.    Plaintiff and Class Members purchased and received healthcare services from IMH for personal, family, or household purposes.

188.    IMH engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure its

40

clients' Private Information in a manner that complied with applicable laws, regulations, and industry standards.

189.  IMH makes explicit statements to its patients that their Private Information will remain private.

190.  IMH's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. IMH violated this duty by failing to implement reasonably secure data security policies.

191.  IMH further violated the ICFA by failing to notify its current and former patients and employees of the data breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

192.  Due to the Data Breach, Plaintiff and Class Members have lost property in the form of their Private Information. Further, IMH's failure to adopt reasonable practices in protecting and safeguarding its clients' Private Information will force Plaintiff and Class Members to spend time or money to protect against identity theft. Plaintiff and Class Members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for IMH's practice of collecting and storing Private Information without appropriate and reasonable safeguards to protect such information.

193.    As a result of IMH's violations of the ICFA, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in IMH's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## VII.    PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against IMH as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representatives, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seek appropriate injunctive relief designed to prevent IMH from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## VIII.   JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: December 17, 2025                    Respectfully submitted,

                                           */s/: Gary M. Klinger*
                                           Gary M. Klinger
                                           **MILBERG PLLC**
                                           227 W. Monroe Street, Suite 2100
                                           Chicago, IL 60606
                                           Tel: (866) 252-0878
                                           gklinger@milberg.com

                                           William B. Federman*
                                           Jessica A. Wilkes*
                                           **FEDERMAN & SHERWOOD**
                                           10205 N. Pennsylvania Ave.
                                           Oklahoma City, OK 73120
                                           Tel: 405-235-1560
                                           Fax: 405-239-2112
                                           wbf@federmanlaw.com
                                           jaw@federmanlaw.com

                                           *Counsel for Plaintiff and the Putative Class*

                                           **Pro Hac Vice Forthcoming*